4 P.3d 37

2000-NMCA-054

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Abe TAPIA, Defendant–Appellant.**

**No. 20,158.**

Court of Appeals of New Mexico.

May 17, 2000.

Certiorari Denied, No. 26,378,
June 22, 2000.

Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, Santa Fe, for Appellee.

David Henderson, Santa Fe, for Appellant.

## OPINION

WECHSLER, Judge.

{1} Defendant Abe Tapia appeals his conviction for aggravated assault on a peace officer (Officer Keith Mundy). Defendant raises three issues on appeal. First, Defendant argues that the district court erred when it refused to find as a matter of law that Officer Mundy's arrest of Defendant's son was illegal. Second, Defendant argues that the jury instruction addressing lawful discharge was misleading and confusing for the jury. Third, Defendant argues that his conviction is not supported by sufficient evidence because Officer Mundy was not acting in the lawful discharge of his duties at the time of the assault. We determine that a reasonable juror could have been confused by the jury instruction on lawful discharge and therefore reverse.

*Facts*

{2} The testimony was conflicting, and this Court does not reweigh the evidence on appeal. Rather, all disputed facts are resolved in favor of the prevailing party and all reasonable inferences are made in support of the verdict. *See State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We therefore discuss the facts in the light most favorable to the State, the prevailing party in this case.

{3} Officer Mundy testified that he responded to a call concerning criminal damage to property which occurred at the De Vargas Mall in Santa Fe. The victim, Christopher Yardman, claimed that Eric Gonzales had damaged his truck. Sometime later, while Officer Mundy was investigating the property damage claim, he was again called to the De Vargas Mall regarding a fight. When he arrived, the same victim, Christopher Yardman, was being placed into an ambulance. Officer Mundy interviewed Yardman at the scene and later at the hospital. Yardman

identified his assailants as Eric Gonzales and Johnny Tapia (Johnny). Yardman described the vehicle driven by the assailants, gave their addresses, and gave directions to Johnny's residence.

{4} Officer Mundy also testified that he worked on the two cases for approximately two hours without interruption. During that time, Officer Mundy made calls to the on-duty assistant district attorney to keep her informed about his investigation. Officer Mundy testified that he believed, and was also told by the assistant district attorney, that he did not need an arrest warrant to arrest Johnny because he was pursuing an ongoing investigation.

{5} Officer Mundy further testified that after deciding to go to Johnny's home, he secured the assistance of Officer John Howard as back-up. Officer Mundy and Officer Howard drove to Johnny's home at about 11:30 p.m. The officers saw three barking dogs in a fenced yard in front of the home. According to Officer Howard's testimony, one of the dogs, Rocky, ran to the gate and tried to push his head through a space in the fence while baring his teeth and growling.

{6} At trial, Defendant testified that there was enough slack in the fence for a dog to get through the gate. The State offered testimony that Rocky was a difficult dog to control, and Defendant and his wife admitted to Rocky's history of biting people.

{7} Defendant testified that he heard Rocky barking and went outside to investigate. Officer Mundy testified that he told Defendant that he needed to talk to his son, Johnny. Defendant held Rocky and told the officers, "Let's go on in." After entering the home with the officers, Defendant released Rocky into the yard.

{8} Officer Mundy testified that when Johnny came into the living room from his room, Officer Mundy could see that Johnny had been in a fight because his hands were swollen and red. Officer Mundy told Johnny that he was under arrest. At some point, either just before or just after Officer Mundy told Johnny he was under arrest, Defendant's demeanor changed from cordial and cooperative to hostile and agitated. Defendant argued that he needed to see an arrest warrant and instructed his son not to say anything. While Officer Mundy and Defendant were exchanging words, Johnny walked back to his room and shut the door. Officer Mundy testified that he feared that Johnny was going to get a weapon out of his room and that he therefore followed Johnny to his room. Defendant followed after Officer Mundy. Officer Mundy testified that when he and Defendant reached the door of Johnny's room, Defendant pinned him against the door jamb and grabbed his arm. Defendant testified that he merely moved in front of Officer Mundy and told him that he could not go into the room. At this point, Officer Howard stepped in and told Defendant to come to the living room and sit down. Officer Mundy went into the room and saw that Johnny was using a portable or cellular telephone. Officer Mundy took the telephone from Johnny, arrested and handcuffed him, and brought him to the living room.

{9} At this point, Rocky was at the front door, growling and baring his teeth. Officers Mundy and Howard testified that Defendant said something to the effect that he would like to see the officers get by Rocky. Officer Mundy checked his mace canister and found it to be almost empty. He testified that he asked Defendant more than once to restrain the dog but that Defendant refused and that he then told Defendant that he would use his weapon if Rocky came after them. According to Officer Mundy, Defendant threatened to shoot him if he shot Rocky. He partially drew his weapon before Defendant agreed to hold Rocky.

{10} Thereafter, Officer Howard and Johnny left the house followed by Officer Mundy while Defendant held Rocky by the collar. There was conflicting testimony about whether Rocky was lunging at that time. Although Defendant testified to the contrary, Officers Mundy and Howard testified that Defendant told the dog, "Get him" several times as the group attempted to leave the yard. Officer Mundy testified that he backed out of the yard and that when he was approximately one foot away from the gate, Defendant released the dog. Officer Mundy testified that he hit a pole in his attempt to

get through the gate before the dog got there. Officer Howard testified that the dog was released as he was about to take Johnny through the gate and Officer Mundy was about eight to ten feet away.

### Jury Instructions

#### Instructions Given

{11} The district court instructed the jury on both aggravated assault on a peace officer and the lesser charge of aggravated assault. The instructions included elements instructions for both crimes. The elements instruction for aggravated assault on a peace officer named the victim as "Officer Keith Mundy". The elements instruction for aggravated assault named the victim as simply "Keith Mundy". The court also instructed the jury on the necessity of exigent circumstances to make an arrest in Instruction No. 12, and the court instructed the jury on lawful discharge in Instruction No. 11. Instruction No. 11 reads in its entirety as follows:

> A Defendant does not have the right to assault a police officer, regardless of whether the police officer's conduct is lawful or unlawful, if the officer is acting in good faith within the scope of his duties.

> An officer is engaged in the performance of his official duties if he is simply acting within the scope of what the officer is employed to do. The test is whether the officer is within that compass or is engaging in a personal frolic of his own.

#### Test for Lawful Discharge of Duties

{12} The crime of aggravated assault upon a peace officer is defined as "unlawfully assaulting or striking at a peace officer with a deadly weapon while he is in the lawful discharge of his duties." NMSA 1978, § 30–22–22(A) (1971). At trial, Defendant argued that Officer Mundy did not act within the lawful discharge of his duties when he arrested Defendant's son. Defendant therefore contends that if Officer Mundy was not acting in the lawful discharge of his duties, the State failed to prove all the elements of the crime.

{13} The standard for determining whether an officer was acting within his or her lawful discharge of duties is whether the officer was performing his or her official duties. *See State v. Doe,* 92 N.M. 100, 103, 583 P.2d 464, 467 (1978). According to *Doe,* even if an officer makes an arrest without probable cause, the officer is performing official duties if the officer is acting in good faith and within the scope of what the officer is employed to do. *See id.* " 'The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own.' " *Id.* (quoting *United States v. Heliczer,* 373 F.2d 241, 245 (2d.Cir.1967)).

{14} *State v. Frazier,* 88 N.M. 103, 104–05, 537 P.2d 711, 712–13 (Ct.App.1975), relied upon by Defendant, does not require a different standard from *Doe.* Our Supreme Court in *Doe* considered whether a police officer acted within the "lawful discharge of his duties" when engaging in an unlawful arrest. *Doe,* 92 N.M. at 103, 583 P.2d at 467 (citations omitted). The Court distinguished *Frazier* on the basis that the officer in *Frazier* did not have a "legitimate reason for stopping the defendant," *id.* at 105, 537 P.2d at 713, the officer was acting in a civil matter, and the officer admitted that "he had no grounds to believe [the] defendant was committing or had committed a criminal offense." *Id.* at 104–05, 537 P.2d at 712–13. Since *Doe,* the holding in *Frazier* has been limited. *Frazier* does not hold, as Defendant suggests, that an officer's actions must be lawful to fall within the officer's official duties. Under *Doe,* there is a significant difference between not having a "legitimate reason" to act and acting unlawfully in the context of this case. *Id.*

### Instruction on Illegality of the Arrest

{15} Defendant argues that Officer Mundy acted illegally when he came to the residence and arrested Johnny. Officer Mundy did not obtain a warrant for the arrest, and, according to Defendant, exigent circumstances did not exist to justify a warrantless arrest. *See Campos v. State,* 117 N.M. 155, 159, 870 P.2d 117, 121 (1994) (holding that under the New Mexico Constitution, a warrantless arrest is invalid unless probable cause and exigent circumstances exist to support the arrest). Defendant contends

that he was therefore entitled to a directed verdict on the issue of the illegal arrest.

{16} As we have outlined above, the fact that an arrest was unlawful does not preclude a finding that an officer acted in the "lawful discharge" of his duties. *See Doe,* 92 N.M. at 103, 583 P.2d at 467 (stating that officer acting in good faith remains in lawful discharge of his duties, whether the officer's actions are lawful or unlawful); *State v. Jones,* 114 N.M. 147, 152, 835 P.2d 863, 868 (Ct.App.1992) (holding that absent evidence of bad faith, officers acted in official capacity despite illegality of stop). Defendant was not entitled to a directed verdict on the illegality of the arrest because such determination is not controlling in deciding whether an officer is acting within the lawful discharge of his duties.

{17} In addition, sound public policy favors protecting police officers from assault or battery, regardless of whether the officer's actions were technically legal or illegal. As our Supreme Court observed in *Doe,* societal interests demand that a police officer carrying out his or her duties in good faith be free from threat or physical harm. *See Doe,* 92 N.M. at 102–03, 583 P.2d at 466–67. If the officer acts illegally, those harmed may pursue private remedies rather than potentially exacerbating excitable circumstances by acting at the scene. *See id.; see also State v. Chamberlain,* 112 N.M. 723, 729, 819 P.2d 673, 679 (1991) (holding officer's illegal presence in home insufficient to constitute provocation for murder).

{18} Alternatively, Defendant argues that if he was not entitled to a directed verdict, the court should have instructed the jury that the arrest was illegal. We do not agree. The district court correctly conveyed the standard by which the jury should have evaluated the officer's actions under *Doe* by instructing the jury as follows:

An officer is engaged in the performance of his official duties if he is simply acting within the scope of what the officer is employed to do. The test is whether the officer is within that compass or is engaging in a personal frolic of his own.

This portion of the instruction was sufficient to instruct the jury of the substance of the lawful discharge of an officer's duties. As we have previously discussed, any further instruction in line with Defendant's argument would have been irrelevant to the matter before the jury. *See Doe,* 92 N.M. at 103, 583 P.2d at 467. The district court did not err in refusing Defendant's tendered instruction. *See State v. Rivera,* 115 N.M. 424, 432, 853 P.2d 126, 134 (Ct.App.1993) (discerning no error in trial court's refusal of jury instruction containing "unnecessary" information); *cf. State v. Tave,* 1996–NMCA–056, ¶ 19, 122 N.M. 29, 919 P.2d 1094 (reversing conviction upon use of prejudicial jury instruction containing irrelevant information).

{19} Furthermore, instructing the jurors on the illegality of the arrest would likely serve to confuse them. While the issues of the legality of the officer's actions and the lawful discharge of an officer's duties are facially similar, this similarity only complicates the substantive distinction between the concepts of "lawful discharge" on one hand and "lawful arrest" on the other.

{20} Search and seizure concepts—such as "unlawful arrest"—are not, however, entirely irrelevant to the lawful discharge inquiry. The district court may wish to assist the jury in its determination of the lawful discharge of an officer's duties by instructing the jury about the substantive aspects of law pertinent to the theory of the defense. *See State ex rel. Highway Dep't. v. Strosnider,* 106 N.M. 608, 612, 747 P.2d 254, 258 (Ct.App. 1987). The district court assisted the jury in this case by instructing about the law of arrest and exigent circumstances in Instruction No. 12. The district court, therefore, did not err by instructing the jury on exigent circumstances and denying Defendant's motion for a directed verdict on the illegality of Johnny's arrest.

*Error in Lawful Discharge Instruction*

{21} Despite the fact that the instructions correctly reflected *Doe* and assisted the jury to evaluate the evidence, the instructions were nonetheless flawed. Instruction No. 11, the lawful discharge instruction, was the only instruction that explained the term

"lawful discharge" to the jury. Naturally, the jury would turn to this instruction for an explanation of the lawfulness of Officer Mundy's conduct. As noted earlier, the instruction correctly sets forth the requirements of *Doe. See Doe*, 92 N.M. at 103, 583 P.2d at 467. But the instruction also included a factor not pertinent to the jury's analysis, that is, whether Defendant had a right to assault a police officer.

{22} At trial, Defendant did not claim that he had a right to assault Officer Mundy. Such a claim would have been a complete defense to all assault charges. Instead, Defendant claimed that the State had failed to prove the "lawful discharge" element of Section 30–22–22. Instruction No. 11 incorrectly focuses upon Defendant's right to assault a police officer, an issue that was not a part of Defendant's theory of defense. We believe that the instruction could have confused the jurors and caused them to believe that they were choosing between whether Defendant had an absolute right to assault Officer Mundy and whether Officer Mundy was acting in lawful discharge of his duties. *See State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994) (stating that reversible error can arise from instructions that confuse or misdirect a reasonable juror). Given that choice, the jury would have been much more likely to find that Officer Mundy was acting in lawful discharge of his duties than it might have otherwise, especially since the issue of Defendant's right to assault a police officer had not been injected into the trial previously. *See State v. Stampley*, 1999–NMSC–027, ¶ 48, 127 N.M. 426, 982 P.2d 477 (reversing for new trial when jury instructions left no alternative but to consider a vague definition of a crime that lead to two possible interpretations, one of which was completely erroneous).

{23} The State contends that it is unlikely that the jury would be confused by Instruction No. 11 because Defendant did not argue that he had a right to assault Officer Mundy and because excessive force was not an issue in the case. We agree that Defendant would not have been entitled to a jury instruction on the question because he did not make it a theory of the case. *Cf. State v. Baca*, 114 N.M. 668, 673, 845 P.2d 762, 767 (1992) ("If the evidence supports a theory of the case, the defendant is entitled to an instruction on that theory."). However, it is on this basis that we consider Instruction No. 11 confusing to the jury. The instruction introduced an issue into the case relating to one of the elements of the crime and the jury would not know how to apply the concept to the evidence presented.

{24} Additionally, the other instructions given do not cure the error. *See Parish*, 118 N.M. at 41–42, 878 P.2d at 990–91. As noted above, the elements instruction for aggravated assault with a deadly weapon merely deletes the lawful discharge element, as well as Officer Mundy's title. This instruction does not discuss the "lawful discharge" question. Similarly, the instruction regarding exigent circumstances and the validity of an arrest does not address the question of a "right to assault" that is raised by the lawful discharge instruction. These instructions do not clarify the confusion the jury might have experienced due to Instruction No. 11.

{25} Considering the instructions as a whole, we conclude that a reasonable juror could have been confused or misdirected by the lawful discharge instruction. *See Parish*, 118 N.M. at 42, 878 P.2d at 991. Therefore, we reverse Defendant's conviction.

*Sufficiency of the Evidence*

{26} Having concluded the verdict below was entered upon flawed jury instructions, we must now review the sufficiency of the evidence supporting that verdict. *See State v. Rosaire*, 1996–NMCA–115, ¶ 20, 123 N.M. 250, 939 P.2d 597. If the verdict is not supported by the required quantum of evidence, retrial is barred; however, if substantial evidence was presented at trial in support of his conviction, this matter will be remanded for a new trial. *See State v. Post*, 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App. 1989). We reach this issue for a second reason, as well: Defendant challenges the standard by which the jury is to judge Officer Mundy's actions.

{27} We first address Defendant's argument as to the applicable standard. De-

fendant asserts that whether an officer is acting within the lawful discharge of his or her duties can only be measured by an objective reasonable officer standard. In this regard, Defendant argues that Officer Mundy's conduct was not objectively reasonable because a reasonable officer would have known that Johnny's arrest was illegal. Defendant's argument then proceeds to the conclusion that because Officer Mundy's conduct could not be considered reasonable, the State failed to prove the element of lawful discharge beyond a reasonable doubt. Defendant also argues that any subjective belief that Officer Mundy may have had about the legality of his actions is not determinative because, under the objective standard, Officer Mundy's actions were contrary to established Fourth Amendment principles.

{28} Defendant relies on *Frazier*, 88 N.M. at 104, 537 P.2d at 712, for the proposition that lawful discharge is measured only by the objective reasonable officer standard. In *Frazier*, the officer stopped the defendant who ran from a motel room after being evicted. *See id.* When the officer stopped the defendant a second time, the defendant hit him. *See id.* We held that there were no reasonable grounds for restraining the defendant "absent a reasonable belief that a criminal offense had been committed." *Id* . at 105, 537 P.2d at 713.

{29} It is true that there is an objective aspect of the lawful discharge standard in that conduct that a reasonable officer would believe to be unlawful will not fall within the lawful discharge of an officer's duties, regardless of the participating officer's belief about its legality. *See Doe*, 92 N.M. at 103, 583 P.2d at 467. Objectively unreasonable conduct could not, under *Doe*'s definition, be within the compass of an officer's duties. *See id.* This objective aspect of the standard ensures that officers cannot remain deliberately ignorant of the requirements of the Constitution and law and still be considered to be in lawful discharge of their duties.

{30} However, we have never applied a purely objective standard in determining whether officers have acted lawfully; indeed, *Doe* emphasizes the subjective aspect of the lawful discharge issue. *See Doe*, 92 N.M. at 103, 583 P.2d at 467. Under *Doe*, an officer acts in good faith if the officer was not on a personal frolic. *See id.* The officer's state of mind is therefore relevant in considering whether the officer is engaged in the lawful discharge of the officer's official duties because the issue of personal frolic is answered only by looking at what the officer himself or herself believed. Thus, the proper standard by which to measure whether an officer is acting in the lawful discharge of his or her duties is subjective, provided that the conduct is not such that a objectively reasonable officer would not consider it to be unlawful.

{31} Turning to the sufficiency of the evidence, the relevant facts are that: (1) Officer Mundy was actively investigating a crime; (2) Officer Mundy contacted the assistant district attorney for advice as to whether an arrest warrant was needed and was advised to the contrary; (3) without any break in the investigation, Officer Mundy decided to go to the suspect's residence to confirm his involvement in the crime; (4) once there, Officer Mundy was invited into the residence by the suspect's father and saw evidence satisfying him of the suspect's role in the crime; (5) believing that he could arrest the suspect without a warrant, Officer Mundy informed him that he would be arrested; (6) when the suspect ran into another room, Officer Mundy followed him to ensure that there was no threat to him or his partner.

{32} We note that *Campos* encourages officers to continue investigations and obtain more, not less, information before obtaining an arrest warrant. *See Campos*, 117 N.M. at 159, 870 P.2d at 121. Furthermore, each case should be evaluated on its facts. *See id.* at 158, 870 P.2d at 120. Finally, it is significant that Officer Mundy obtained advice from the assistant district attorney, who presumably knows the law of warrantless arrests, before he decided that he could arrest the suspect. These considerations support

our conclusion that Officer Mundy acted reasonably. Thus, there was sufficient evidence for the jury to have reasonably concluded that Officer Mundy was acting within the scope of his duties.

## Conclusion

{33} For the reasons stated above, we reverse Defendant's conviction and remand for a new trial.

{34} **IT IS SO ORDERED.**

APODACA and ARMIJO, JJ., concur.