2008-NMSC-006

176 P.3d 299

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Felipe PADILLA, Defendant–Respondent.**

**No. 29,947.**

Supreme Court of New Mexico.

Jan. 8, 2008.

Gary K. King, Attorney General, Patricia A. Gandert, Assistant Attorney General, Santa Fe, NM, for Petitioner.

John Bigelow, Chief Public Defender, JK Theodosia Johnson, Assistant Appellate Defender, Santa Fe, NM for Respondent.

## OPINION

BOSSON, Justice.

{1} Defendant was convicted of the crime of aggravated fleeing a law enforcement officer which elevates to a felony certain willful and careless vehicular flight from a police officer conducting a pursuit "in accordance with the provisions of the Law Enforcement Safe Pursuit Act." NMSA 1978, § 30–22–1.1 (2003). In this opinion, we decide as a matter of first impression whether the State has to prove, as an element of the crime, not only the unlawful conduct of the accused, but also the propriety of the police officer's conduct during the pursuit. The Court of Appeals held that the manner in which the officer conducted the pursuit was an essential element of the crime of aggravated fleeing and reversed Defendant's conviction for failure to instruct the jury on that issue. We reverse and reinstate Defendant's conviction.

## BACKGROUND

{2} Defendant Felipe Padilla's conviction arose from his flight from a police officer on the night of October 14, 2003. Around 2:00 a.m., a Portales police officer became suspicious of Defendant when he drove his Buick down an alley, parked, but did not get out of the car. The officer called in Defendant's license plate number and determined that Defendant was in violation of registration statutes, NMSA 1978, § 66–3–18(C) (1998) and NMSA 1978, § 66–3–19 (1995). The officer activated his emergency lights, and in response, Defendant accelerated and ran a stop sign.

{3} The officer turned on his siren and began pursuing Defendant. Defendant continued to flee the police officer at speeds up to eighty miles per hour running a total of ten stop signs. Eventually, Defendant entered a mobile home sales lot, got out of his car, and attempted to flee on foot. Defendant was arrested shortly thereafter.

{4} The pursuing police officer testified that he was in uniform, wearing his badge, and was in a marked police vehicle. He also testified that, along with Defendant, there were two passengers in the car and that at times during the pursuit the passenger door would open four to six inches due to a broken latch. At one point during the pursuit another motorist was on the roadway in the vicinity of the speeding vehicles. Defendant crossed the center line four times while turning corners at high speed. Based on the way Defendant was driving, the officer charged Defendant with several misdemeanors and the felony of aggravated fleeing a law enforcement officer.

{5} The text of the aggravated fleeing statute reads:

A. Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit *in accordance with the*

*provisions of the Law Enforcement Safe Pursuit Act* [29–20–1 NMSA 1978].

    B.  Whoever commits aggravated fleeing a law enforcement officer is guilty of a fourth degree felony.

Section 30–22–1.1 (emphasis added).

{6} The aggravated fleeing statute specifically refers to the Law Enforcement Safe Pursuit Act ("the LESPA" or "the Act"). NMSA 1978, §§ 29–20–1 to –4 (2003). Both statutes passed the 2003 Legislature as part of the same bill and became effective the same day, July 1, 2003. *See* 2003 N.M. Laws, ch. 260, §§ 1–6. The LESPA establishes police training regarding the "safe initiation and conduct of high speed pursuits," § 29–20–3, and creates a mechanism to establish and enforce local high speed pursuit policies. *See* § 29–20–4(A) ("The chief law enforcement officer of every state, county and municipal law enforcement agency shall establish and enforce a written policy governing the conduct of law enforcement officers . . . .").

**STANDARD OF REVIEW**

{7} The outcome of this appeal hinges on the interpretation of the two statutes at issue. This Court reviews questions of statutory interpretation de novo. *State v. Rivera*, 2004–NMSC–001, ¶ 9, 134 N.M. 768, 82 P.3d 939. We first look to the plain language of the statute to determine if the statute can be enforced as written. *See State v. Davis*, 2003–NMSC–022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 ("Under the plain meaning rule statutes are to be given effect as written without room for construction . . . ."). If the language of the statute is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity, or contradiction," the court should reject the plain meaning rule in favor of construing the statute "according to its obvious spirit or reason." *Id.* (citing *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 347–48, 871 P.2d 1352, 1353–54 (1994)).

**DISCUSSION**

{8} The question raised by this appeal is whether the Legislature intended the phrase "in accordance with the provisions of the [LESPA]" found at the end of the aggra-

vated fleeing statute to be an essential element of the crime of aggravated fleeing. If, as Defendant claims, the Legislature intended the phrase to be an essential element, then the jury should have been instructed to that effect, and a pursuit not "in accordance" with the LESPA would nullify an otherwise valid arrest and prosecution for aggravated fleeing. *See* Rule 5–608(A) NMRA ("The court must instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury."); *State v. Rosaire*, 1997–NMSC–034, ¶ 13, 123 N.M. 701, 945 P.2d 66.

{9} Our Court of Appeals concluded that "a reasonable reading of the phrase 'in accordance with' requires an evaluation of how police conduct the pursuit caused by a defendant." *State v. Padilla*, 2006–NMCA–107, ¶ 17, 140 N.M. 333, 142 P.3d 921. In interpreting the aggravated fleeing statute, that Court did not rely solely on the plain meaning of the text, but also looked to the purpose of the statute and the relationship between the aggravated fleeing statute and the LESPA. *Id.* ¶¶ 13–21. The Court then determined that "the policy objectives of the Act and the aggravated fleeing statute," were advanced by the plain language of the aggravated fleeing statute. *Id.* ¶ 14 ("This reading promotes the policy objectives of the Act and the aggravated fleeing statute by (1) more severely punishing a person who flees in a car in a dangerous manner, while at the same time (2) requiring that police obey the legislature's rules relating to high speed pursuits."). As a result, under the Court of Appeals' interpretation, a defendant may not be convicted of aggravated fleeing, even if it is undisputed that the defendant's conduct was exactly that which the Legislature sought to punish. The prosecutor would also have to prove that local law enforcement agencies have established a high speed pursuit policy which complies with the requirements of the Act and with which the officer can be shown to have complied. *Id.* ¶ 20.

{10} We are mindful that legislative intent is our touchstone when interpreting a statute. *See State v. Smith*, 136 N.M. 372, 98 P.3d 1022, 2004–NMSC–032, ¶ 8. 136

N.M. 372, 98 P.3d 1022 ("Our ultimate goal in statutory construction 'is to ascertain and give effect to the intent of the Legislature.'" (quoting *State v. Cleve*, 1999–NMSC–017, ¶ 8, 127 N.M. 240, 980 P.2d 23)). "'Not only must the legislative intent be given effect, but the court will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature.'" *State ex rel. Helman*, 117 N.M. at 352, 871 P.2d at 1358 (quoting *State v. Nance*, 77 N.M. 39, 46, 419 P.2d 242, 247 (1966)). Accordingly, we now undertake our "judicial responsibility to search for and effectuate the legislative intent." *Id.* at 353, 871 P.2d 1352, 871 P.2d at 1359.

## AGGRAVATED FLEEING A LAW ENFORCEMENT OFFICER

{11} We look first to general principles underlying criminal law to inform our analysis. Criminal liability is typically defined by the conduct of the accused, not the conduct of the police officer or the law enforcement agency tasked to enforce the criminal code. A criminal code has two primary functions. First, a criminal code "defines conduct which is deemed sufficiently injurious to the interests of the individual or community to warrant the protection of a criminal law." 1 Charles E. Torcia, *Wharton's Criminal Law* § 1, at 2 (15th ed.1993). Second, a criminal code "provides a punishment for the criminal conduct, geared primarily to the gravity of the offense, yet broad enough in latitude to accommodate the characteristics of individual offenders." *Id.* "The substantive criminal law is that law which, for the purpose of preventing harm to society, declares what conduct is criminal and prescribes the punishment to be imposed for such conduct." 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.2, at 11 (2d ed.2003).

{12} Typically, criminal liability is premised upon a defendant's culpable conduct, the *actus reus*, coupled with a defendant's culpable mental state, the *mens rea*. 1 LaFave, *supra*, § 1.2(b), at 14 ("[T]he physical conduct and mental state must concur."); 1 Torcia, *supra*, § 27, at 164 ("[A] crime is committed only if the evil doer harbored an evil mind."). The focus of both requirements is

on the accused. *Id.* § 27, at 168–71 (describing the various statutory definitions of mental states by focusing on the actor and his conduct); *see also Black's Law Dictionary* 1373 (8th ed.2004) (defining "scienter" as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp. as a ground for civil damages or criminal punishment").

{13} Similarly, a legislature may choose to differentiate between crimes based on aggravating conduct of the accused, and it may impose differing degrees of punishment based upon the severity of the crime. "It is for the legislative branch of a state or the federal government to determine, within state or federal constitutional limits, the kind of conduct which shall constitute a crime and the nature and extent of punishment which may be imposed therefor." 1 Torcia, *supra*, § 10, at 37–38. A crime is "aggravated" when it is "made worse or more serious by circumstances such as violence, the presence of a deadly weapon, or the intent to commit another crime." *Black's Law Dictionary*, *supra*, at 71. An "aggravating circumstance" is defined as "[a] fact or situation that increases the degree of liability or culpability for a criminal act." *Id.* at 259. Again, it is the conduct of the accused that is relevant when considering aggravating circumstances.

{14} In the aggravated fleeing statute, the New Mexico Legislature has adhered to these general principles of criminal law. The text of the statute focuses on the accused's conduct and the accused's knowledge and intent when the accused chooses to engage a police officer in a high speed pursuit. The legislative decision to create the crime of aggravated fleeing suggests a hierarchy of criminal liability based on the aggravated nature of a defendant's conduct. In the aggravated fleeing statute, the Legislature created a more severe punishment, a felony, when a person "willfully and carelessly driv[es] his vehicle in a manner that endangers the life of another." Section 30–22–1.1(A). When a person resists, evades, or obstructs an officer by fleeing without willful and careless driving, that conduct is a mere

misdemeanor. *See* NMSA 1978, § 30–22–1 (1981). Because fleeing is "made worse or more serious," *Black's Law Dictionary, supra,* at 71, when the person flees in a manner that endangers the lives of others, the Legislature chose to make the crime a fourth degree felony, *see* § 30–22–1.1(B). Thus, the defendant's conduct gives rise to the imposition of the heightened punishment. That heightened punishment, however, has no apparent relation to the propriety of the law enforcement agency's pursuit policy. The manner in which the officer conducts a high speed pursuit is not logically a "fact or situation that increases the degree of liability or culpability for a criminal act." *Black's Law Dictionary, supra,* at 259.

{15} We acknowledge that some of the officer's conduct, as it relates to a defendant's knowledge, is relevant to criminal liability under the aggravated fleeing statute. The scienter requirement of aggravated fleeing is satisfied when the defendant flees a law enforcement officer with both: (a) the knowledge that the individual is a law enforcement officer, as designated by his uniform and marked vehicle, and (b) the knowledge that the law enforcement officer has signaled him to stop, either by use of a visual or audible signal. *See* § 30–22–1.1(A). Therefore, the requirements that the officer be in a marked vehicle, be in uniform, and instruct the driver to stop create the backdrop against which the *defendant's* knowledge is evaluated.

{16} In this respect, the knowledge requirement for aggravated fleeing is similar to that for the crime of aggravated assault of a peace officer. *Cf.* NMSA 1978, § 30–22–22 (1971) (requiring a defendant's knowledge as to identity of peace officer); *see also Reese v. State,* 106 N.M. 498, 499, 745 P.2d 1146, 1147 (1987) (holding that a defendant's knowledge of the peace officer's identity is a necessary element of the crime). In the crime of aggravated assault of a peace officer, the peace officer's conduct in identifying himself is necessary to prove scienter. *Reese,* 106 N.M. at 499, 745 P.2d at 1147 ("Although [aggravated assault on a peace officer and battery of a peace officer] do not require knowledge of the victim's identity as an element of the

respective crimes, we nonetheless conclude that scienter is a necessary element of these crimes, and thus indispensable to the jury's consideration of the case."). Similarly, a police officer, before engaging a suspect in high speed pursuit, must identify himself as indicated in the statute, and proof of a defendant's knowledge about the *identity* of the police officer becomes an essential element of the crime of aggravated fleeing. *Cf.* UJI 14–2216 NMRA Use Note 1 ("This instruction is to be given if there is a question of fact as to whether or not the defendant knew that the victim was a law enforcement officer.").

{17} In the instant case, all of these elements of the crime of aggravated fleeing were proven at trial, including scienter. The officer testified that he was in uniform, wearing his badge, and in a marked vehicle. He signaled Defendant to stop, using both visual and audible signals. In response to the officer's signals to stop, Defendant drove in a willful and careless manner that endangered the lives of others-he ran ten stop signs, he exceeded the speed limit, there was at least one other motorist, apart from the officer, potentially placed at risk because of Defendant's conduct, and the passengers in the car were placed at risk when Defendant careened around corners causing the door with the faulty lock to open. Defendant's criminal liability arises from his knowledge that he was fleeing from a law enforcement officer, and his reckless conduct during the ensuing pursuit.

{18} Occasionally, the Legislature will link criminal liability not only to knowledge of an officer's status but also, to a limited degree, to the manner in which the officer conducts himself. For example, portions of the misdemeanor resisting, evading or obstructing statute require the state to prove that the peace officer was acting in "the lawful discharge of his duties." Section 30–22–1(D); *see also* UJI 14–2215 NMRA (describing essential elements of the crime of resisting, evading or obstructing an officer). Section 30–22–1(D), as well as Section 30–22–1(B), is an example of the Legislature enacting a statute criminalizing certain behavior so as to provide law enforcement officers with a nec-

essary tool for their own protection and to aid them in the performance of their duties.

{19} In the case of aggravated assault on a peace officer, the Legislature enhanced the severity of the crime, as compared to aggravated assault on the general public, based upon the victim's status as a peace officer in lawful discharge of his duties. *See State v. Rhea*, 93 N.M. 478, 480, 601 P.2d 448, 450 (Ct.App.1979). The crime of aggravated assault on a peace officer requires the State to prove that the officer "was performing the duties of a peace officer." UJI 14–2209 NMRA; *see also Rhea*, 93 N.M. at 480, 601 P.2d at 450 ("The requirement that the peace officer be performing his duties is an element of peace officer assault upon which the jury must be instructed."). It is apparent that the Legislature intended to protect peace officers in the discharge of their duties by imposing a more serious consequence upon those who assault them.

{20} Significantly, instances in which the Legislature makes an officer's conduct, as opposed to knowledge of his identity, an element of the crime are rare. To the best of our knowledge, the Legislature has chosen to diverge from the established norms of criminal liability discussed above generally only in those circumstances when the officer becomes a victim of the illegal conduct, or when the Legislature seeks to protect a law enforcement officer while he is discharging his duties. And even then, the State must only prove that the officer was performing official duties, not that the officer complied with every detail of local policy. Outside of these limited exceptions, the norm remains to gauge the severity of a crime by the conduct of the accused, not by the conduct of the officer tasked with arresting the accused.

{21} These rare exceptions to the general rule are of little help to Defendant. The aggravated fleeing statute does not focus upon the officer as a victim. The statute appears to be designed to protect the general public from the dangers of a high speed chase. In the case of aggravated assault, the officer's performance of official duties is necessary to prove knowledge that the *victim* was in fact an officer in lawful discharge of his duties. In contrast, the manner in which the officer pursues a fleeing suspect, as opposed to his identity, is not logically an aggravating factor; it does not factor into the suspect's knowledge that he is fleeing an officer nor affect his degree of culpability.

{22} Most of the time, a fleeing suspect simply would not know if the officer was pursuing him "in accordance with the provisions of the [Act]." Section 30–22–1.1(A). And, even assuming that a defendant did know that the officer was pursuing him in compliance with the Act, that knowledge in no way establishes his intent to flee a law enforcement officer. Instead, as mentioned above, the officer's conduct, wearing his uniform, being in a marked car, and signaling the defendant to stop, establishes a defendant's knowledge that he is fleeing a police officer. As such, it is a fair inference that the Legislature intended to make those parts of the officer's conduct that establishes scienter, i.e., the accused's knowledge that he is fleeing an officer, elements of the crime of aggravated fleeing. That same inference, however, seems too attenuated when applied to the propriety of the police officer's conduct during the chase, conduct of which the defendant would be unaware.

{23} Notwithstanding the foregoing analysis of criminal norms, Defendant argues, and our Court of Appeals agreed, that the officer's conduct in pursing a suspect, and not just a defendant's knowledge of an officer's identity, is an element of the crime that must be proven by the State beyond a reasonable doubt. In so doing, the Court of Appeals attributes to the Legislature an intent to achieve a result that, at a minimum, is unorthodox and inconsistent with generally accepted norms of criminal law. Defendant's construction of the statute would absolve the accused of careless and life-endangering conduct, based solely upon the details of a police agency's pursuit plan and the actions of the officer in compliance with that plan. Following the logic of Defendant's argument, we could easily anticipate that the status of a local police agency's pursuit policy and the details of an officer's compliance would become a trial within a trial, potentially consuming more time and resources than proof of the defendant's aggravated flight. With-

out questioning the authority of our Legislature to enact such a law, we would be remiss in our duties of judicial review if we did not demand a high level of confidence before concluding that the Legislature intended such an unorthodox result. In seeking to resolve the ultimate question of legislative intent, we now turn to the second statute at issue, the LESPA.

## LAW ENFORCEMENT SAFE PURSUIT ACT

{24} By establishing standards for the "safe initiation and conduct of high speed pursuits," the LESPA protects the public from dangers that might arise when a suspect engages a law enforcement officer in a high speed chase. Section 29-20-3(A). The Act mandates a course of instruction for the New Mexico law enforcement academy, and requires that local law enforcement agencies create and enforce local pursuit policies. *See* §§ 29-20-3, -4. The Act defines a high speed pursuit, using terms similar to those used in the aggravated fleeing statute, but without any reference to the propriety of the chase. *See* § 29-20-2 (" '[H]igh speed pursuit' means an attempt by a law enforcement officer in an authorized emergency vehicle to apprehend an occupant of a motor vehicle, the driver of which is actively attempting to avoid apprehension by exceeding the speed limit."). The Legislature established a statutory scheme that enables law enforcement officers to make more knowledgeable decisions about how and when to pursue a suspect.

{25} Significantly, the Legislature included an enforcement mechanism within the text of the LESPA itself. The Act requires not only that the local chief law enforcement officer establish a local pursuit policy, but also that the local chief law enforcement officer *enforce* that policy. *See* § 29-20-4(A) ("The chief law enforcement officer of every state, county and municipal law enforcement agency *shall establish and enforce a written policy governing the conduct of law enforcement officers* employed by the agency who are involved in high speed pursuits."). As this language demonstrates, the Legislature contemplated that the LESPA would be enforced locally and that the local pursuit policy would govern law enforcement officers' conduct.

{26} The Court of Appeals determined that the Legislature included the phrase "in accordance with the provisions of the [LESPA]" as an external enforcement mechanism. *Padilla*, 2006-NMCA-107, ¶ 16, 140 N.M. 333, 142 P.3d 921. The Court of Appeals noted that the denial of a conviction acts as a penalty for failure to comply with the LESPA and that, like the exclusionary rule, such a penalty "is a time-honored way to motivate police compliance with the law." *Id.* (citing *United States v. Brooks*, 438 F.3d 1231, 1240 (10th Cir.2006) (discussing the exclusionary rule)). Because of the unique nature of the exclusionary rule, we must hesitate before drawing an analogy between the exclusionary rule and the statutes at issue here.

{27} First, we are reluctant to extend the rationale behind the exclusionary rule to the aggravated fleeing statute because the exclusionary rule is a court-made doctrine fashioned out of necessity to protect principles articulated in the United States and New Mexico Constitutions. The aggravated fleeing statute, however, is not rooted in either Constitution. We are merely interpreting the intent of the Legislature in enforcing its own policy, not constitutional protections or the policies of this Court.

{28} Second, as we have said, the Legislature has affirmatively expressed its choice of an enforcement mechanism for the LESPA. This decision acknowledges the efficacy of internal mechanisms as a means of encouraging compliance with the LESPA. *See Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 2168, 165 L.Ed.2d 56 (2006) "[I]t is not credible to assert that internal discipline, which can limit successful careers, will not have a deterrent effect." In addition to internal enforcement, private remedies, such as civil rights claims under 42 U.S.C. § 1983 (2000), may be available should the chief law enforcement officer not establish a local policy or police not adhere to it. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (holding that inadequate police training may form the basis for liability under § 1983 when "the failure to train amounts to deliberate indif-

ference to the rights of persons with whom the police come into contact"). For these reasons, the exclusionary rule provides little support for the inference of an additional enforcement mechanism that is neither stated nor implied in either of the two statutes at issue.

{29} Other provisions of the LESPA shed light on the Legislature's intent behind the enactment of the aggravated fleeing statute and the reference to the LESPA contained within that statute. The Legislature mandated that local agencies must establish a local pursuit policy in Section 29–20–4(A) but chose not to set a date by when local agencies must establish such a policy. *Compare* § 29–20–4 (no date requirement) *with* § 29–20–3 (pursuit training to be in effect no later than December 31, 2004). The lack of a date by when a local agency must comply with the Act is significant; it gives the chief local law enforcement officer discretion over when to establish a pursuit policy for that agency. Under Defendant's reading of the aggravated fleeing statute, the chief law enforcement officer's discretion over when to establish a local pursuit policy in a specific jurisdiction would, in effect, give local law enforcement a veto over a legislatively created criminal statute. In our view, this conclusion is inconsistent with the Legislature's intent.

{30} Significantly, the crime of aggravated fleeing became effective on July 1, 2003, and nothing in the aggravated fleeing statute suggests anything other than a legislative expectation that the crime would be enforced as of that date. Yet, because the LESPA also went into effect on July 1, 2003, it would be impossible for a local agency to establish a pursuit policy by July 1, 2003, the date the crime of aggravated fleeing went into effect. During that interim period the crime of aggravated fleeing would not have been enforceable anywhere in the entire State. And, because local agencies have discretion as to when to adopt their pursuit policy, enforcement of the crime of aggravated fleeing would only occur piecemeal.

{31} Furthermore, the Act, read as a whole, demonstrates that the Legislature anticipated local variations in the content of specific pursuit policies. The Act permits a chief law enforcement officer to define the conditions under which an officer may engage or terminate a high speed pursuit, *see* § 29–20–4(B)(1), alternative measures to be utilized for apprehending a fleeing suspect, *see* § 29–20–4(B)(2), and the coordination of high speed pursuits with other agencies and officers, both within the jurisdiction and in other jurisdictions, *see* § 29–20–4(B)(3), (4). Because the Act does not specifically mandate the entire content of the local policy, but leaves significant portions of the policy to the discretion of the chief law enforcement officer, the Act creates the very real possibility that local pursuit policies will vary from locale to locale.

{32} While the Act allows for variations in *pursuit policies,* Defendant's interpretation would allow for variations in *criminal liability* among different locations of the State which seems inconsistent with the State's duty to protect all citizens equally regardless of locale. It would be unprecedented for our Legislature to create and define a crime that appears to have statewide effect, only to leave it up to local agencies to decide when and where it will be enforced. Because the text of the LESPA allows for such variations within local policies, it seems unlikely that the Legislature intended compliance with the Act to be an essential element of the crime of aggravated fleeing.

{33} Our conclusion that the Legislature did not intend the phrase to be an essential element of the crime does not render the phrase mere surplusage. *See State v. Javier M.,* 2001–NMSC–030, ¶ 32, 131 N.M. 1, 33 P.3d 1 (" 'A statute must be construed so that no part of the statute is rendered surplusage or superfluous.' " (quoting *Katz v. New Mexico Dep't of Human Servs.,* 95 N.M. 530, 534, 624 P.2d 39, 43 (1981))). The Legislature did specify that pursuits should be "in accordance" with the LESPA, which lays out policy criteria for police officers to consider in deciding when and how to engage in high speed pursuit of suspects. Those policies are important and they will be enforced. The language of the LESPA reposes enforcement responsibility with law enforcement itself. Without diminishing the significance of those policies, we conclude only that the Legisla-

ture did not intend to make compliance with those policies an essential element of the crime of aggravated fleeing. The Legislature did not intend to create an additional enforcement mechanism for compliance with what amounts to a regulatory scheme, by conditioning criminal liability upon compliance with that policy. Instead, the legal obligation to comply with the LESPA is enforceable and mandatory as described in the Act itself.

## CONCLUSION

{34} We hold that the phrase "in accordance with the provisions of the [LESPA]" is not an essential element of the crime of aggravated fleeing. Because the phrase is not an essential element of the crime, the jury instructions were appropriate as given and Defendant's conviction is reinstated. Accordingly, we reverse the Court of Appeals with respect to Defendant's conviction for aggravated fleeing. We remand this case to the district court to vacate Defendant's conviction for resisting, evading or obstructing in accordance with that part of the Court of Appeals opinion which is not the subject of review herein.

{35} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA and PETRA JIMENEZ MAES, Justices, EDWARD L. CHÁVEZ, Chief Justice (dissenting), and CHARLES W. DANIELS, Justice (dissenting).

CHÁVEZ, Chief Justice (dissenting).

{36} The legislature decides what criminal laws to enact and the essential elements that define each crime. Crimes involving police officers, such as resisting arrest, battery on a police officer, and evading a police officer all have as an element that the police officer was in the lawful discharge of his or her duty. Rather than using the broad language "in the lawful discharge of his duties," the legislature has more narrowly specified those duties when a defendant is charged with aggravated fleeing. Recognizing that both the suspect and the officers put the public at risk during a high speed pursuit, the legislature has specifically required officers in New Mexico to comply with the Law Enforcement

Safe Pursuit Act, NMSA 1978, Sections 29–20–1 to –4 (2003) (the "Safe Pursuit Act" or "the Act"), before a defendant can be found guilty of aggravated fleeing. Because the majority has simply deleted this requirement from the statutory crime of aggravated fleeing, I respectfully dissent.

{37} While on routine patrol, a police officer attempted to pull Defendant over for a registration violation. Defendant sped away with the officer in hot pursuit for what might have been nothing more than a registration violation. Ultimately, in addition to other charges, Defendant was charged with aggravated fleeing in violation of NMSA 1978, Section 30–22–1.1(A) (2003):

> Aggravated fleeing a law enforcement officer *consists of* a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop ... by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle *in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.* ...

(emphasis added). The Safe Pursuit Act and the offense of aggravated fleeing were enacted in the same bill. 2003 N.M. Laws, ch. 260, §§ 1–6. The Act establishes the conditions under which an officer is authorized to engage in a high speed pursuit. Section 29–20–4(B)(1) (requiring the local policy to specify "the conditions under which a law enforcement officer *may engage* in a high speed pursuit and the conditions when the officer *shall terminate* a high speed pursuit") (emphasis added); § 29–20–4(C)(1)–(2) (requiring that the written policy include factors for when an officer "*may initiate* a high speed pursuit" and when an officer "*shall not initiate or continue* a high speed pursuit") (emphasis added). In other words, the Safe Pursuit Act limits the scope of the officer's authority to engage in a high speed pursuit.

{38} Significantly, the minimum requirements of the Safe Pursuit Act include a prohibition against an officer initiating a high speed pursuit unless the officer has reasonable grounds to believe that the suspect "poses a clear and immediate threat of death or serious injury to others or who the officer

has probable cause to believe poses a clear and immediate threat to the safety of others that is ongoing and *that existed prior to the high speed pursuit[.]* " Section 29–20–4(C)(1) (emphasis added). The seriousness of the offense that initiated the high speed pursuit is critical to the analysis. *See* § 29–20–4(C)(3)(a). If the officer did not act in accordance with the Act, then he did not have the authority to engage in a high speed pursuit.

{39} The "pursuit in accordance" portion of aggravated fleeing is analogous to the requirement in other statutes that an officer act "in the lawful discharge of his duties." For example, resisting, evading, or obstructing an officer consists of "resisting or abusing any judge, magistrate or peace officer *in the lawful discharge of his duties.*" NMSA 1978, § 30–22–1(D) (1981) (emphasis added). Similarly, the crime of aggravated assault upon a peace officer requires, as an essential element, that the State prove that the officer was acting in the lawful discharge of his or her duties. *See State v. Tapia,* 2000–NMCA–054, ¶ 12, 129 N.M. 209, 4 P.3d 37 (citing NMSA 1978, § 30–22–22(A) (1971)). This element is sometimes a "severely disputed factual question." *State v. Kraul,* 90 N.M. 314, 317, 563 P.2d 108, 111 (Ct.App. 1977) (battery upon a peace officer, NMSA 1953, § 40A–22–23).

{40} It is significant that the legislature chose not to use the phrase "in the lawful discharge of his duties"; it chose instead to use the phrase "in accordance with the . . . Safe Pursuit Act." The more specific language, coupled with the creation of the two statutes in a single bill, indicates that the officer's authority should be evaluated with respect to the Safe Pursuit Act. This also recognizes that it is not just the suspect, but also the officer, who puts the public in danger during a high speed pursuit. *See* § 29–20–3(B) (recognizing "the need to balance the known offense and risk posed by a fleeing suspect against the danger to law enforcement officers and other people *by initiating* a high speed pursuit") (emphasis added). It is incongruous to believe that the legislature intended compliance with the Safe Pursuit Act to be irrelevant when elevating a misde-

meanor evading an officer charge to a fourth-degree felony.

{41} The language of a statute determines the essential elements of an offense. *State v. Rhea,* 93 N.M. 478, 480, 601 P.2d 448, 450 (Ct.App.1979). As a result, the well-reasoned opinion of the Court of Appeals is persuasive that, by using the phrase "in accordance with the provisions of the [Safe Pursuit Act]," the legislature intended compliance with the Act to be an essential element of aggravated fleeing. *State v. Padilla,* 2006–NMCA–107, ¶ 13, 140 N.M. 333, 142 P.3d 921. When the statute's language is clear and unambiguous, this Court is bound by the plain meaning rule. *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 352, 871 P.2d 1352, 1358 (1994). We may depart from the plain language "only under rare and exceptional circumstances." *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156 (1930). In this case, the Act clearly states that a pursuit must comply with the Safe Pursuit Act. Unless there is a clear intent otherwise, we must assume that the legislature chose its words advisedly. *State v. Maestas,* 2007–NMSC–001, ¶ 22, 140 N.M. 836, 149 P.3d 933 (citations omitted). We must do so even if we believe that the legislature did not consider all of the consequences that would result from its choice of words. *Burch v. Foy,* 62 N.M. 219, 223, 308 P.2d 199, 202 (1957).

{42} The majority renders meaningless and superfluous the language "in accordance with the provisions of the [Safe Pursuit Act.]" Section 30–22–1.1(A). This approach violates the rule of statutory construction that a court must construe statutes to avoid rendering a portion of the statute superfluous. *State v. Javier M.,* 2001–NMSC–030, ¶ 32, 131 N.M. 1, 33 P.3d 1.

{43} Interpreting the aggravated fleeing statute to require compliance with the Safe Pursuit Act gives effect to the entire statutory scheme. As noted by the Court of Appeals, it seems reasonable that the legislature included the phrase "in pursuit in accordance with the provisions of the [Safe Pursuit Act]" to "motivate police to abide by the legislature's promulgated rules regarding safe pursuits." *Padilla,* 2006–

NMCA–107, ¶ 13, 140 N.M. 333, 142 P.3d 921 (citations omitted). The Court of Appeals held that "[t]his reading promotes the policy objectives of the Act and the aggravated fleeing statute by (1) more severely punishing a person who flees in a car in a dangerous manner, while at the same time (2) requiring that police obey the legislature's rules relating to high speed pursuits." *Id.* ¶ 14. One important rule is not engaging in a high speed pursuit when the suspect does not pose a clear and immediate threat of death or serious injury to others.

{44} The majority's concern that proof of compliance with the Safe Pursuit Act will be unorthodox and consume greater resources is misplaced. Majority Opinion ¶ 23. Just as a jury is instructed to consider whether an officer was acting in the lawful discharge of his or her duties when a defendant is charged with evading a police officer, a jury can be instructed to consider whether a police officer initiated a high speed pursuit when having reasonable grounds to believe that the suspect "poses a clear and immediate threat of death or serious injury to others or who the officer has probable cause to believe poses a clear and immediate threat to the safety of others that is ongoing and that existed prior to the high speed pursuit[.]" *See* § 29–20–4(C)(1). Such an analysis focuses squarely on the conduct of a defendant. A jury can also be instructed to weigh the factors enumerated in the Act and decide whether "the immediate danger to the officer and the public created by the high speed pursuit exceed[ed] the immediate danger to the public if the occupants of the motor vehicle being pursued remain[ed] at large[.]" *See* § 29–20–4(C)(2)–(3). Indeed, the majority has rewritten the crime of aggravated fleeing to require a greater showing for the misdemeanor crime of evading a police officer than what is required for the felony. To prove the misdemeanor, the prosecution must prove beyond a reasonable doubt that the officer was in the lawful discharge of his or her duties, but such a showing is not required under the majority construction of aggravated fleeing. This is inconsistent with the legislature's intent.

{45} For the foregoing reasons, I respectfully dissent.

I CONCUR: CHARLES W. DANIELS, Justice.