This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**                                                    **NO. A-1-CA-34456**

**TAD WILLIAM WOODS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

{1}     As a result of a series of events that occurred in Bent, New Mexico, on the evening of November 1, 2011, a jury found Defendant Tad William Woods guilty of aggravated burglary, larceny of a firearm, two counts of aggravated assault with a deadly weapon, aggravated fleeing a law enforcement officer, shooting at a dwelling, breaking and entering, and three counts of negligent child abuse. The district court entered judgment against Defendant in accordance with the jury verdicts and sentenced Defendant to thirty-eight years' imprisonment.

{2}     On appeal, Defendant (1) challenges the sufficiency of the evidence to convict him of all but the child abuse charges and one of the two aggravated assault with a deadly weapon charges, (2) argues that the district court committed instructional error, (3) contends he was unfairly prejudiced by certain testimony that was admitted at trial, (4) complains his right to a speedy trial was violated, and (5) claims he received ineffective assistance of counsel. We affirm.

**BACKGROUND**

{3}     Prior to October 2011, Defendant and Doralene Sanders, along with Sanders' two younger daughters (ages five and seventeen at the time), had been living together on Sanders' property. After Defendant moved out, Sanders changed the locks on her home and did not give Defendant the new keys or the new combination to the locks. On November 1, 2011, Defendant called Sanders to see if she and her younger

daughter wanted to go out and eat. Sanders noticed that Defendant was intoxicated when they spoke, and the conversation did not last long. When Defendant continued to call her "over and over and over" later in the day, Sanders would not answer his calls. When Sanders, who was not at home at the time, finally took Defendant's call, Defendant "was screaming, cussing [Sanders] out, asking why [Sanders] changed the locks on the garage, saying that [Sanders] couldn't keep [Defendant] out," and asked where Sanders was. Sanders lied to Defendant regarding her whereabouts because she was scared.

{4}     Upon returning home later that evening with her five-year-old daughter, who was asleep in the backseat of the vehicle, Sanders saw Defendant coming down the hill from her property. As Sanders was pulling into her driveway and up to her house, Defendant rear-ended Sanders' vehicle. Defendant rear-ended Sanders' vehicle a second time after Sanders had parked, putting Sanders in fear of her and her daughter's safety. Defendant then got out of his truck, started beating the windshield of Sanders' vehicle, insisted that Sanders and her daughter exit the vehicle, and threatened to get in his truck and push Sanders' vehicle through the house. Sanders noticed, then, that the doors to her home and garage were wide open and that lights were on that were not on before. When Sanders asked Defendant how he had gotten into the house, Defendant told her "he had a key to open up anything" and that she

3

could not keep him out. Sanders later concluded that Defendant must have entered through the window in her spa room. Defendant eventually left Sanders' property, but not before he accused her of "sleeping with everybody," threatened her with belts, pulled her hair and repeatedly slapped her, and threatened to kill himself. Soon after leaving, Defendant called Sanders and told her that he had taken her .38-caliber revolver that she kept under her mattress. Upon checking and seeing that the gun was gone, Sanders called the Otero County Sheriff's office to report the stolen gun, which was loaded, and that Defendant had gone to the church near her house.

{5}	Otero County Sheriff's Deputy Edward Garcia and Sergeant Geraldine Martinez responded to the call and went to the church. Deputy Garcia, who was in uniform and driving a marked vehicle, drove to the back of the church, turned on his emergency lights, and positioned his vehicle to block Defendant's truck. Defendant, who was still inside his truck, backed up and attempted to drive around Deputy Garcia's vehicle. Deputy Garcia blocked Defendant's truck with his vehicle but then got out and ran because Defendant's vehicle "came at [him]" like Defendant "was going to run [him] over," causing Deputy Garcia to fear for his life. Defendant, ignoring Deputy Garcia's repeated orders to get out of his truck, then used his truck to hit Deputy Garcia's vehicle before fleeing the scene. As Defendant was fleeing the church parking lot,

4

Sergeant Martinez—who had witnessed Defendant "ramming" Deputy Garcia's vehicle—shot at Defendant, striking and non-fatally wounding him in the head.

{6}     Defendant returned to Sanders' home and proceeded to shoot at the front door and into the house. One of the shots became lodged in the door; the other penetrated the door, struck the wall above a bedroom door on the far side of the house, and landed on the floor in front of the bedroom. Sanders, who was inside with both of her daughters—the older one having returned home just prior to Defendant's reappearance—and having heard "gunfire going through [the] home," hid with her daughters in a bedroom closet and called 911. Defendant entered the house by breaking a bedroom window and held Sanders and her daughters hostage for over three hours before he eventually surrendered.

{7}     Defendant was charged with thirteen different counts, twelve of which were tried together to a jury,[1] and ten of which the jury convicted him. This appeal resulted.

**DISCUSSION**

{8}     Defendant makes numerous arguments on appeal, which we consolidate as follows: (1) the State failed to present sufficient evidence to convict Defendant of shooting at a dwelling, aggravated burglary, breaking and entering, larceny of a firearm, aggravated assault with a deadly weapon, and aggravated fleeing a law

---

[1]The parties stipulated to sever and try separately Count 13 because of the potentially prejudicial nature of the charge.

5

enforcement officer; (2) the district court committed fundamental error by failing to instruct the jury on an essential element of aggravated fleeing; (3) Defendant was unfairly prejudiced by certain testimony elicited at trial; (4) Defendant's right to a speedy trial was violated; and (5) Defendant received ineffective assistance from his trial counsel because trial counsel failed to request an intoxication instruction. We address each issue in turn.

**I. The State Presented Sufficient Evidence to Convict Defendant of All Complained-of Counts**

{9}    Defendant argues that there was insufficient evidence to support his convictions for (1) aggravated burglary (Count 1), (2) larceny of a firearm (Count 2), (3) aggravated assault with a deadly weapon based on rear-ending Sanders' vehicle (Count 3), (4) aggravated fleeing a law enforcement officer (Count 5), (5) shooting at a dwelling (Count 7), and (6) breaking and entering (Count 9). We disagree.

**Standard of Review**

{10}    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). Our review involves a two-step process in which we first "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable

6

inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We then "evaluate whether the evidence, so viewed, supports the verdict beyond a reasonable doubt." *State v. Garcia*, 2016-NMSC-034, ¶ 24, 384 P.3d 1076. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. The appellate courts "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations, internal quotation marks, and citation omitted).

**The State Presented Sufficient Evidence to Support Defendant's Aggravated Burglary Conviction**

{11}     The jury in this case was instructed in pertinent part that in order to convict Defendant of Count 1, the State had to prove beyond a reasonable doubt that Defendant: (1) "entered a dwelling without authorization"; (2) "entered the dwelling with the intent to commit a theft when inside"; and (3) "became armed with a .38 revolver after entering[.]" The jury heard from Sanders that she had changed her locks and not given Defendant the key or combination code to enter, meaning he did not have authorization to enter her dwelling. Sanders also testified that Defendant called and told her that he had taken her .38 revolver from under her mattress—i.e., became

7

armed with it—and that she immediately verified that the gun was missing. Regarding the element of intent, the intent to commit theft can be reasonably inferred from evidence showing that property was, indeed, stolen from within a dwelling. *See State v. Mireles*, 1971-NMCA-027, ¶ 6, 82 N.M. 453, 483 P.2d 508 (explaining that evidence that property from within a residence had been stolen indicated an intent to commit theft). Furthermore, a jury may rely on circumstantial evidence to infer that the defendant intended to commit a theft, *see State v. Tixier*, 1976-NMCA-054, ¶¶ 6-7, 89 N.M. 297, 551 P.2d 987, and "burglarious intent can be reasonably and justifiably inferred from the unauthorized entry alone." *State v. Castro*, 1979-NMCA-023, ¶ 19, 92 N.M. 585, 592 P.2d 185, *overruled on other grounds by Sells v. State*, 1982-NMSC-125, ¶¶ 7-10, 98 N.M. 786, 653 P.2d 162. Viewed in the light most favorable to affirming the guilty verdict, the facts support the jury's determination that Defendant committed an aggravated burglary.

**The State Presented Sufficient Evidence to Convict Defendant of Larceny of a Firearm**

{12}     The jury was instructed in pertinent part that in order to convict Defendant of Count 2, the State had to prove beyond a reasonable doubt that (1) Defendant "took and carried away a .38 revolver, belonging to another[,]" and (2) "[a]t the time [Defendant] took this property, [D]efendant intended to permanently deprive the owner of it[.]" The jury heard from Sanders that Defendant took Sanders' .38 revolver

8

and that he did not have Sanders' permission to do so, thus satisfying the first element. Detective Fabian Picazo of the Otero County Sheriff's Office testified that when he responded to the call at Sanders' residence on November 1, he observed, through a window, Defendant standing with a pistol in his hand, pointed towards the closet area. Sanders' older daughter testified that at one point that night, she gained control of the gun but that Defendant threatened to hurt her if she did not give it back, so she gave the gun back to Defendant. She also testified that when the police were trying to get Defendant to surrender, they instructed him to leave the gun, which Defendant refused to do. From all of the evidence adduced at trial, the jury could reasonably infer that Defendant intended to permanently deprive Sanders of her gun at the time he took it. *See State v. Roybal*, 1960-NMSC-012, ¶ 6, 66 N.M. 416, 349 P.2d 332 (explaining that in larceny cases, intent "may be inferred by the jury from the facts and circumstances established at the trial"). Thus, there was sufficient evidence to convict Defendant of Count 2.

**The State Presented Sufficient Evidence to Convict Defendant of Aggravated Assault With a Deadly Weapon**

{13}    The jury in this case was instructed, in accordance with UJI 14-305 NMRA, that in order to convict Defendant of Count 3, the State had to prove beyond a reasonable doubt the following:

1.    [D]efendant rammed . . . Sanders' vehicle with his vehicle;

9

2. [D]efendant's conduct caused . . . Sanders to believe [D]efendant was about to intrude on . . . Sanders' bodily integrity or personal safety by touching or applying force to . . . Sanders in a rude, insolent or angry manner;

3. A reasonable person in the same circumstances as . . . Sanders would have had the same belief;

4. [D]efendant used a deadly weapon. [D]efendant used a motor vehicle. A motor vehicle is a deadly weapon only if you find that a motor vehicle, when used as a weapon, could cause death or great[] bodily harm;

5. This happened in New Mexico on or about the 1st day of November, 2011.

Sanders testified that Defendant used his truck to rear-end her vehicle twice: once as she was still driving up her driveway, and once after she had parked. She also testified that this caused her to fear for her and her daughter's safety. From this evidence, the jury could reasonably convict Defendant of Count 3.

**The State Presented Sufficient Evidence to Convict Defendant of Aggravated Fleeing a Law Enforcement Officer**

{14} The jury was instructed that in order to convict Defendant of Count 5, the State had to prove beyond a reasonable doubt the following:

1. [D]efendant operated a motor vehicle;

2. [D]efendant drove willfully and carelessly in a manner that endangered the life of another person;

10

3. [D]efendant had been given a visual or audible signal to stop by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle[;]

4. [D]efendant knew that a law enforcement officer had given him a[n] audible or visual signal to stop;

5. This happened in New Mexico on or about the 1st day of November, 2011.

Deputy Garcia's testimony supplies sufficient evidence to support Defendant's conviction. Deputy Garcia testified that he was in uniform and a fully marked law enforcement vehicle; that he engaged his vehicle's lights as he approached Defendant's truck at the back of the church; that he repeatedly ordered Defendant to get out of Defendant's truck; that Defendant ignored his orders and proceeded to ram into Deputy Garcia's vehicle before driving away; and that Defendant's conduct caused Deputy Garcia to fear for his life. From this, the jury could reasonably find that Defendant drove "willfully and carelessly in a manner that endangered the life of another person[,]" the only element Defendant challenges as unsupported by substantial evidence. UJI 14-2217 NMRA. Moreover, as our Supreme Court has explained,

When a person resists, evades, or obstructs an officer by fleeing without willful and careless driving, that conduct is a mere misdemeanor. *See* NMSA 1978, § 30-22-1 (1981). Because fleeing is made worse or more serious when the person flees in a manner that endangers the lives of others, the Legislature chose to make the crime a fourth degree felony,

11

*see* § 30-22-1.1(B). Thus, the defendant's conduct gives rise to the imposition of the heightened punishment.

*State v. Padilla*, 2008-NMSC-006, ¶ 14, 143 N.M. 310, 176 P.3d 299 (internal quotation marks and citation omitted). Here, it was the fact that Defendant not only attempted to evade Deputy Garcia by driving away from him but also rammed Deputy Garcia's vehicle and drove toward Deputy Garcia like "he was going to run [Deputy Garcia] over" that supports Defendant's conviction for *aggravated* fleeing. The act of ramming his truck into Deputy Garcia's vehicle made Defendant's act "worse or more serious," thus warranting his conviction of a more serious crime. *See id.*

**The State Presented Sufficient Evidence to Convict Defendant of Shooting at a Dwelling**

{15}     In pertinent part, the jury was instructed that in order to convict Defendant of Count 7, the State had to prove beyond a reasonable doubt that Defendant "willfully shot a firearm at a dwelling[.]" Sanders testified that after Defendant returned to her house from the church, she heard "gunfire going through [the] home." Kevin Massis, a crime scene investigator with the New Mexico State Police, testified that there was one bullet lodged inside the front door and one that ended up in front of a bedroom located across the house. The jury was also shown diagrams of the house and photographs taken inside the house that showed the relationship between the front

12

door—where Defendant shot the gun—and where the bullets landed. From this evidence, the jury could convict Defendant of Count 7.

**The State Presented Sufficient Evidence to Convict Defendant of Breaking and Entering**

{16}     In pertinent part, the jury was instructed, in accordance with UJI 14-1410 NMRA, that in order to convict Defendant of Count 9, the State had to prove beyond a reasonable doubt that (1) Defendant "entered a dwelling without permission"; and (2) "[t]he entry was obtained by the breaking of a bedroom window[.]" Sanders testified that she did not give Defendant keys and the combination to the new locks she installed after Defendant moved out of her house, allowing the jury to conclude that Defendant did not have permission to enter the house. Norman Rhoades, a crime scene investigator with the New Mexico State Police, testified that he identified Defendant's entry point as a bedroom window, which had a screen that had been forced inward. The State presented to the jury photographs of the bedroom window with the screen pushed in and ripped, as well as the crime scene investigator's diagram showing numerous blood stains around the window and on the bed just inside the window. We conclude that this was sufficient evidence for the jury to convict Defendant of Count 9.

13

## II. Aggravated Fleeing Jury Instruction

{17}    Defendant argues that the district court committed fundamental error by giving a jury instruction for aggravated fleeing that omits an essential element of the crime. We disagree.

{18}    Under NMSA 1978, Section 30-22-1.1(A) (2003), aggravated fleeing a law enforcement officer

> consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

UJI 14-2217 identifies the following as the essential elements that the state must prove in order to convict a defendant of aggravated fleeing:

1.    The defendant operated a motor vehicle;

2.    The defendant drove willfully and carelessly in a manner that endangered the life of another person;

3.    The defendant had been given a visual or audible signal to stop by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle;

4.    The defendant knew that a law enforcement officer had given him an audible or visual signal to stop[.]

14

Defendant contends that UJI 14-2217—used in this case— "omit[s] the most essential element of the crime of aggravated fleeing—that [the defendant] actually ignored the officer's signal and did not stop." According to Defendant, "[t]he jury instruction does not require any finding that the defendant drove in the specified manner after being signaled by the officer." Defendant's argument is without merit.

{19}     Paragraph 3 of UJI 14-2217—specifically the phrase "[t]he defendant *had been given* a visual or audible signal to stop"—provides the necessary language to make clear that the defendant's operation of a motor vehicle occurred *after* the defendant had been signaled by law enforcement to stop. UJI 14-2217 (emphasis added). Paragraph 4 provides further reinforcement and clarification by requiring the jury to find that the defendant "*knew* that a law enforcement officer *had given him* an audible or visual signal to stop[.]" *Id.* (emphases added). As Defendant points out, "[t]he statute requires that the [s]tate prove the defendant drove in the proscribed manner *after* being given a signal by law enforcement." UJI 14-2217 commensurately requires the jury to find that the state has proven that the "defendant operated a motor vehicle" in a "willful[] and careless[] manner" and that such operation occurred at a time when the "defendant had been given a . . . signal to stop[,]" i.e., *after* being signaled.

{20}     Our ultimate objective in reviewing jury instructions is to "seek to determine whether a reasonable juror would have been confused or misdirected by the

15

instruction." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citation omitted). We conclude that the aggravated fleeing instruction given in this case included all of the essential elements contained in Section 30-22-1.1 and would not have been confusing or misleading to a reasonable juror.

## III.    Unfair Prejudice Resulting From Certain Testimony

{21}    Defendant complains that statements made by three testifying law enforcement officers—Deputy Garcia, Sergeant Martinez, and Detective Picazo—suggested that Defendant "had prior domestic violence charges" and had previously been incarcerated, unfairly prejudicing him and necessitating reversal of his convictions and remand for a new trial. The specific statements Defendant complains of are: (1) Deputy Garcia's statement that he could identify Defendant because while he did not know Defendant at the time of the events in question on November 1, 2011, he had "served subpoenas to [Defendant] at the jail," thus allowing him to identify Defendant in court; (2) Detective Picazo's statement that he had "prior dealings" with Defendant, including when Detective Picazo responded to a "domestic" call at Sanders' residence; and (3) Sergeant Martinez's statement indicating that she had responded to a call at Sanders' house "three weeks prior" to the November 1 incident. {22}    With respect to the testimony of Detective Picazo and Sergeant Martinez, we understand Defendant

16

to argue that the district court erred by failing to exclude certain evidence under Rule 11-403 NMRA, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Ordinarily, we review a district court's Rule 11-403 decision for an abuse of discretion. *State v. Otto*, 2007-NMSC-012, ¶ 14, 141 N.M. 443, 157 P.3d 8. Here, however, we note that defense counsel neither objected to any of the now-complained-of statements made by Detective Picazo and Sergeant Martinez nor moved to strike any testimony elicited on cross-examination. Thus, Defendant failed to preserve his claims of error in accordance with Rule 11-103(A) NMRA. We, therefore, decline to further consider Defendant's Rule 11-403 argument with respect to Detective Picazo's and Sergeant Martinez's statements. *See State v. Rael-Gallegos*, 2013-NMCA-092, ¶ 39, 308 P.3d 1016 (declining to review Rule 11-403 claim that was not preserved).

**{23}** With respect to Deputy Garcia's testimony, we note that the district court, indeed, sustained Defendant's objection to Deputy Garcia's testimony that he had served subpoenas to Defendant in jail and provided a curative instruction to the jury. We understand Defendant's argument that he should be granted a new trial as a claim that the district court erred by denying his request for a mistrial, a decision we review for an abuse of discretion. *See State v. Caudillo*, 2003-NMCA-042, ¶ 12, 133 N.M. 468, 64 P.3d 495. When Deputy Garcia testified that he came to know who Defendant

17

was and could identify him in court because he had "served subpoenas to [Defendant] at the jail," defense counsel requested and the district court immediately held a bench conference during which defense counsel moved for a mistrial. The district court denied the motion, noting that the prosecutor had not elicited Deputy Garcia's statement and explaining that "some passing notion that [Defendant] may have spent some time in jail . . . isn't so prejudicial" as to warrant a mistrial. The district court, however, offered to give a "corrective instruction" to the jury, which defense counsel accepted and the district court immediately gave, explaining that the jury was to disregard Deputy Garcia's statement that he had "encountered . . . Defendant in jail" and that the statement "is not to enter into the jury deliberations in any way and should not influence [the] verdict."

{24}     We can see no abuse of discretion in the district court's denial of Defendant's motion for a mistrial. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted). Particularly in light of the facts that (1) Deputy Garcia's explanation of how he came to know who Defendant was came *after* defense counsel challenged Deputy Garcia's personal knowledge of Defendant's identity, (2) the prosecutor did not solicit

18

the "in jail" statement, and (3) a curative instruction was immediately given, we conclude the district court did not abuse its discretion by refusing to grant a mistrial. *See id.* ¶ 14 (explaining that there is "no need for a mistrial" when "a court promptly sustains an objection and admonishes the jury to disregard the evidence" in a case where there is an unsolicited mention of the defendant's "revoked license for prior convictions").

## IV.    Speedy Trial

{25}    Defendant concedes that he failed to preserve this issue below and raises it as fundamental error under Rule 12-321(B)(2) NMRA (formerly Rule 12-216(B)(2) NMRA). Because of the fact-dependent nature of a speedy trial claim and Defendant's failure not only to demand a speedy trial but also to invoke a ruling by the district court, we are left in a position where we effectively have nothing to review. *See Rojo*, 1999-NMSC-001, ¶¶ 49-52 (explaining that "an appropriate motion to protect constitutional speedy[]trial rights requires the weighing of factors that are factually based," that "fact-finding is a function of the district court," and concluding that the record failed to establish a basis for considering the defendant's unpreserved speedy trial challenge (alterations, internal quotation marks, and citations omitted)); *State v. Valdez*, 1990-NMCA-018, ¶¶ 14-16, 109 N.M. 759, 790 P.2d 1040 (quoting with approval *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975), for the

proposition that "[a] complete failure to raise [a speedy trial claim] in the trial court . . . precludes [an appellate court's] consideration of the issue on appeal, for the simple reason that there is nothing to review" and declining to entertain an unpreserved claim of a speedy trial violation); *see also State v. Lopez*, 2008-NMCA-002, ¶¶ 24-25, 143 N.M. 274, 175 P.3d 942 (explaining that "[i]t is well-settled law that in order to preserve a speedy trial argument, [the d]efendant must properly raise it in the lower court and invoke a ruling" and holding that even though the defendant filed motions demanding a speedy trial, she failed to preserve her argument because the district court never held a hearing on her demand).

{26} Moreover, in order to prevail on a claim of fundamental error, Defendant must "demonstrate the existence of circumstances that 'shock the conscience' or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Cunningham*, 2000-NMSC-009, ¶ 21. Defendant has failed to do so, citing no authority and developing no argument as to how the delay in going to trial constituted "such a striking violation of the constitutional right to a speedy trial that it would be appropriate to consider that issue for the first time on appeal." *Rojo*, 1999-NMSC-001, ¶ 53 (internal quotation marks and citation omitted). We note that the record indicates not only that the State diligently prosecuted its case and made every effort to bring Defendant's case to trial in a timely manner but also that it was

20

Defendant who requested and was granted five continuances. The district court, in fact, repeatedly admonished Defendant for the delays he was causing, expressly telling him that it would not hold the delays against the State and that he could not delay going to trial forever. We thus decline to further consider Defendant's speedy trial argument. *See Lopez*, 2008-NMCA-002, ¶¶ 24-25.

**V.      Ineffective Assistance of Counsel**

{27}      Defendant argues that he received ineffective assistance of counsel in violation of the Sixth Amendment because his trial counsel failed to (1) request a voluntary intoxication jury instruction despite sufficient evidence to warrant one, and (2) investigate the "effect of [Defendant] being shot in the head" and how that may have affected Defendant's ability to form specific intent. The State concedes that sufficient evidence existed to support a voluntary intoxication instruction but argues that "a diminished capacity instruction cannot be based on trauma from being shot" because the only specific intent crimes with which Defendant was charged—aggravated burglary and larceny—occurred before Defendant was shot.

{28}      "Habeas corpus proceedings are the preferred avenue for adjudicating ineffective assistance of counsel claims, because the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness." *State v. Grogan*, 2007-NMSC-039, ¶ 9, 142 N.M. 107, 163

21

P.3d 494 (alteration, internal quotation marks, and citation omitted). "When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record." *State v. Roybal*, 2002-NMSC-027, ¶ 19, 132 N.M. 657, 54 P.3d 61. "If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance." *Id.* "To state a claim for ineffective assistance of counsel, a defendant must establish that (1) counsel's performance was deficient, *and* (2) such deficiency resulted in prejudice against the defendant." *Garcia*, 2011-NMSC-003, ¶ 33 (emphasis added).

{29} Assuming without deciding that trial counsel's failure to request a voluntary intoxication instruction constituted deficient performance, we conclude that Defendant has failed to meet his burden because he points to nothing in the record establishing that "as a result of the deficient performance, there was a reasonable probability that the result of the trial would have been different." *State v. Dylan J.*, 2009-NMCA-027, ¶ 38, 145 N.M. 719, 204 P.3d 44 (omission, internal quotation marks, and citation omitted); *see State v. Trujillo*, 2002-NMSC-005, ¶ 38, 131 N.M. 709, 42 P.3d 814 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.

22

Accordingly, [a] defendant must still affirmatively prove prejudice." (alteration, internal quotation marks, and citations omitted)). Defendant has failed to show how trial counsel's failure to request a voluntary intoxication instruction prejudiced him. In fact, he offers no explanation whatsoever of how that claimed deficiency prejudiced his defense. Defendant's only statement regarding prejudice is that trial counsel's "failure to investigate, especially after having requested time to do so, the result of having been shot in the head . . . was prejudicial to [Defendant's] defense in that the jury never even learned of the effect of being shot in the head on one's ability to form specific intent." However, Defendant's contention is purely speculative, and he points to nothing in the record indicating what additional information would have been provided by an expert testifying "regarding the psychological effect on [Defendant] of having been shot by [Sergeant] Martinez" or demonstrated that such additional information had a reasonable probability of changing the result of his trial. Moreover, we agree with the State that the only specific intent crimes with which Defendant was charged were aggravated burglary and larceny, both of which occurred prior to Defendant being shot, meaning that there was neither deficient performance nor prejudice suffered based on trial counsel's decision not to further investigate or present a diminished-capacity defense regarding the effect of Defendant being shot.

{30} We conclude that Defendant has failed to meet his burden of establishing a prima facie case of ineffective assistance and, therefore, decline Defendant's request that we remand for an evidentiary hearing. *Cf. State v. Paredez*, 2004-NMSC-036, ¶ 1, 136 N.M. 533, 101 P.3d 799 (concluding that remand to the district court for an evidentiary hearing was proper where a prima facie case of ineffective assistance of counsel was established by the appellate record). We note, however, that "this decision does not preclude [a d]efendant from pursuing habeas corpus proceedings on this issue should he be able to garner evidence to support his claims." *State v. Bernal*, 2006-NMSC-050, ¶ 36, 140 N.M. 644, 146 P.3d 289.

**CONCLUSION**

{31} For the foregoing reasons, we affirm Defendant's convictions.

{32} **IT IS SO ORDERED.**


_____
**J. MILES HANISEE, Judge**

24

**WE CONCUR:**

_____

**LINDA M. VANZI, Chief Judge**

_____

**JONATHAN B. SUTIN, Judge**