The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **February 11, 2022**

**No. A-1-CA-38641**

**MARK VAN BUSKIRK and LORI VAN BUSKIRK, husband and wife,**

     Plaintiffs-Appellants,

v.

**CITY OF RATON, a New Mexico municipal corporation,**

     Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF COLFAX COUNTY**
**Melissa A. Kennelly, District Judge**

Montgomery & Andrews, P.A.
Stephen S. Hamilton
Kaleb W. Brooks
Santa Fe, NM

for Appellants

Kerry Kiernan, P.C.
Kerry Kiernan
Albuquerque, NM

Utton & Kery, P.A.
Craig T. Erickson

Susan C. Kery
Albuquerque, NM

Ray A. Floersheim
Raton, NM

for Appellee

## OPINION

**YOHALEM, Judge.**

{1}    This is an action for quintuple damages for inverse condemnation brought against the City of Raton, pursuant to NMSA 1978, Section 42A-1-29(B) (1983), by Plaintiffs Mark and Lori van Buskirk. The van Buskirks appeal from the district court's decision granting summary judgment to the City. We affirm.

## THE UNDISPUTED MATERIAL FACTS

{2}    The material facts are undisputed. Triangle Dot Ranch, Inc. (TDR), a New Mexico corporation, was the owner of the approximately 300-acre ranch at issue in this case until 1984, when the corporation was dissolved. Mark van Buskirk was a minority shareholder in TDR. In 1980, TDR sold approximately 27 acres at the southwest end of the ranch to the City for use as a landfill, retaining 214 acres of grazing land adjacent to the landfill to the east, and three tracts totaling 64.77 acres, adjacent to both the landfill and the ranch's grazing land to the southeast.

{3}    Sometime after TDR dissolved (somewhere between 1997 and 1999), the van Buskirks acquired the 214 acres of grazing land as its sole owner. The van Buskirks also held a shared interest with other family members in the three tracts totaling 64.77 acres, adjoining both the grazing land and the landfill. Until 2014, when the City closed the landfill, the van Buskirks complained that trash from the landfill blew onto their grazing land. They accused the City of negligence in failing to cover

the garbage daily with soil. The New Mexico Environment Department fined the City several times for improperly maintaining the landfill.

{4}     In 1997, the van Buskirk family sold the three tracts totaling 64.77 acres (contiguous with both the ranch grazing land and the City landfill) to the City. At the time of purchase, the City intended to use one of the three tracts for a new regional landfill (which was never opened), and another tract as a source of cover soil for the City landfill. From 1998 to 2014, the year the City landfill closed, trash continued to blow onto the van Buskirks' 214-acre grazing land.

**THE PROCEDURAL HISTORY IN THE DISTRICT COURT**

{5}     The van Buskirks filed a pro se complaint on December 9, 2013, alleging negligence by the City for failing to properly cover the trash in the landfill. Recognizing that their negligence claim was likely barred by the statute of limitations, the van Buskirks amended their complaint to allege inverse condemnation, under Section 42A-1-29(A) (Subsection A). The second complaint continued to seek compensation for alleged damage to their 214-acre grazing land from trash blowing from the landfill.

{6}     After filing their inverse condemnation complaint, the van Buskirks obtained counsel and filed a third complaint (first amended complaint for inverse condemnation), dropping their Subsection A inverse condemnation claim, and instead pleading a cause of action for quintuple damages for inverse condemnation

under Section 42A-1-29(B) (Subsection B). Subsection B provides a cause of action for damages for inverse condemnation under limited circumstances. Damages pursuant to Subsection B are calculated at "the greater of the fair market value or a unit rate of five times that of the compensation or consideration [the condemnee or grantor] received for the land [originally] taken[.]" Section 42A-1-29(B)(3).

{7}     The City filed a motion for summary judgment asking the district court to dismiss for failure state a claim under Subsection B. The City contended that unlike Subsection A, which creates a cause of action for either the original owner or "any subsequent grantee" of property that is taken or damaged by a government entity, Subsection B focuses on a prior, original transaction and expressly limits the right of action to the "condemnee or grantor" of previously taken contiguous property. The district court granted summary judgment to the City, finding that the van Buskirks were not the "grantors or condemnees" of the property previously taken for the landfill: TRD was the grantor. The district court agreed with the City that the van Buskirks were not the real parties in interest and that the van Buskirks did not have standing to sue on TDR's behalf.

{8}     Rather than appealing the district court's dismissal of their third complaint, the van Buskirks filed a second amended complaint (fourth complaint). The second amended complaint again sought compensation under Subsection B. This time the van Buskirks claimed standing and real party in interest status based on their 1997

3

sale of the 64.77-acre tract to the City. They claimed that that the City's purchase of the 64.77 acres met the Subsection B(3) requirements for "contiguous to property previously taken" owned by the same "condemnee or grantor." Section 42A-1-29(B)(3). They sought more than $5 million in compensation for the damage to their 214-acre grazing land, five times the per-acre price paid by the City for the 64.77-acre tract.

{9}     The City again filed a motion for summary judgment, contending that the van Buskirks' second amended complaint failed to state a Subsection B claim because there was no damage to their land caused by the public use of the 64.77 acres purchased by the City; any damage arose from the landfill, which was purchased by the City from a different grantor seventeen years before the van Buskirks acquired the adjoining property. The City contended that Subsection B was intended by the Legislature to deter the government from shortchanging a private property owner by purchasing less of his or her property than the government knows will subsequently be damaged or taken for the intended public use. Subsection B provides compensation to the private property owner whose property was subsequently damaged by the public use of adjoining property purchased or taken in the original transaction.

{10}     The van Buskirks responded to the City's motion for summary judgment, claiming that Subsection B, by its plain language, requires only that the City "take[]

4

or damage[] property contiguous to property previously taken or granted from the . . . grantor without making just compensation[.]" Section 42A-1-29(B)(3). The van Buskirks claimed that they met the requirements of that statutory phrase, pointing to the City's purchase of their 64.77-acre tract, and the damage to their contiguous 214 acres of grazing land. Again relying on this phrase from Subsection B(3), the van Buskirks disputed the City's argument that the damage to the contiguous land must be related to the original under-purchase or taking of property from the grantor or condemnee. *See id.*

{11}    The district court granted summary judgment to the City, agreeing with the City that the Legislature did not intend to provide a cause of action for quintuple compensation under the circumstances of this case. The district court focused on the deterrent intent behind the quintuple compensation authorized by Subsection B, concluding that the Legislature's purpose is to use the threat of quintuple compensation to deter "conduct in which the government seeks to save money and shortchange a private property owner by purchasing less than the amount of property actually needed for its public purpose." The district court found that, because the governmental conduct in this case was neither different from nor more reprehensible than the conduct ordinarily involved in a claim for inverse condemnation under Subsection A, this was not the kind of conduct Subsection B was intended to deter. The district court granted the City's motion for summary judgment.

5

**DISCUSSION**

{12}     The van Buskirks argue on appeal that they have stated a cause of action under the plain language of Subsection B(3). The van Buskirks claim that because the 64.77 acres purchased from them by the City (seventeen years after the landfill was purchased from TDR) is contiguous to their 214 acres of grazing land, the facts of this case fit squarely within the plain language of Subsection B(3)'s requirement of damage by the City to land contiguous to land previously purchased from the same grantor.[1] They contend that the district court erred in looking beyond the plain language to legislative intent. Finally, they claim that even if the legislative purpose of Subsection B is considered, their reading of the statute facilitates the statutory goal of broadly deterring the government from purchasing less property from a private landowner than actually needed for public use.

{13}     The City contests the van Buskirks' construction of the statutory language. The City points out that the van Buskirks' "plain meaning" argument relies on a single phrase in Subsection B(3), taken out of context, arguing that the plain meaning of a statute must be determined by looking to the language as a whole. Reading the statute as a whole, the City contrasts the cause of action for inverse condemnation

---

[1]Subsection B applies, by its terms, to property acquired by a government entity with the power of eminent domain either through condemnation or by purchase. Because all of the properties at issue in this case were acquired by the City by purchase from a grantor, we use the term "grantor" in our discussion, rather than the phrase "condemnee or grantor" to simplify the discussion.

adopted by the Legislature in Subsection A, with Subsection B's focus on compensating a particular landowner involved in a transaction where the government under-purchases the grantor's land, for the damage subsequently caused to that landowner's remaining property by the adjoining public use. The City argues that the van Buskirks' interpretation of the statute—to not require any causal connection between the under-purchase of a grantor's land in a prior transaction and the subsequent damage to that same grantor's adjoining land—is not supported by the statute's language or its purpose.

{14}   We agree with the City. We construe Subsection B of the inverse condemnation statute to create a right of action, which provides a statutory measure of "just compensation" to a private landowner when the government uses its power of eminent domain to take or purchase less property than it needs for the intended public use, resulting in damage to the grantor's adjoining property.

## I.   The Guiding Principles of Statutory Interpretation

{15}   This case raises a question of statutory interpretation concerning Subsection B of New Mexico's inverse condemnation statute, Section 42A-1-29(A), (B). The construction of Subsection B is an issue of first impression. Neither the parties, the district court, nor this Court have found a comparable statute in any other state. We, therefore turn to the principles of statutory construction, with the goal of "ascertain[ing] and giv[ing] effect to the intent of the Legislature." *State v. Smith*,

7

2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted).

{16} The interpretation of a statute is an issue of law that is subject to de novo review by our appellate courts. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. We begin the search for legislative intent by first considering the plain language of the statute. *Id.* "[W]e look to the plain language of the statute to determine if the statute can be enforced as written." *State v. Vest*, 2021-NMSC-020, ¶ 14, 488 P.3d 626 (internal quotation marks and citation omitted). In examining the language used by the Legislature, words must be viewed in the context in which they are used in the statute. Every word chosen by the Legislature must be considered and given meaning. *See State v. Farish*, 2021-NMSC-030, ¶ 11, 499 P.3d 622.

{17} The initial question in this regard is whether the words of the statute are so clear that they rule out any ambiguity, confusion, or uncertainty about the statute's meaning. In the absence of ambiguity or uncertainty in the language of the statute, we can give effect to the language as written and need not either construe the language or consider the policy implications flowing from the statutory language. *See id.* As our Supreme Court recognized, however, caution must be exercised in applying this plain meaning rule. *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. It is exceedingly rare to find statutory

language "crystal clear in its meaning[,]" *id.*, "not vague, uncertain, ambiguous, or otherwise doubtful[.]" *Id.* ¶ 22. Even a statute, "apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Id.* ¶ 23. "In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *Id.*

## II. The Plain Language of Subsection B Does Not Support Imposing Liability on the Government Without a Causal Connection to a Prior Transaction

{18} We begin our analysis "by looking first to the words chosen by the [L]egislature." *Farish*, 2018-NMCA-003, ¶ 6 (internal quotation marks and citation omitted), *rev'd in part and remanded*, 2021-NMSC-030. Subsection B states as follows:

> B. Notwithstanding the provisions of Subsection A of this section or any other provision of law regarding compensation for damage in the situation described in that subsection:
>
> (1) if the person authorized [to exercise eminent domain] had taken or been granted for public use, pursuant to a final judgment, an order of immediate possession or private agreement, any property;
>
> (2) the property subsequently taken or damaged was contiguous to the property taken or granted; and
>
> (3) the person takes or damages property contiguous to property previously taken or granted from the condemnee or grantor without making just compensation or without instituting and prosecuting . . . any proceeding for condemnation; the condemnee or

9

grantor shall receive compensation for the land taken or damaged at the greater of fair market value or a unit rate of five times that of the compensation or consideration he received for the land taken; provided that if the width of the property taken or damaged is not equal to the width originally taken or damaged, compensation required pursuant to this subsection shall be increased or reduced ratably in accordance with the relationship of the respective widths.

Section 42A-1-29(B).

{19} The van Buskirks rely on the first phrase in Subsection B(3): "the [condemning authority] takes or damages property contiguous to property previously taken or granted from the condemnee or grantor without making just compensation[.]" Section 42A-1-29(B)(3). This language, they argue, "places no limitation on how the condemning authority takes or damages that property so as to be liable for the prescribed statutory damages." All that need be shown, according to the van Buskirks, is damage to property which happens to be contiguous to property previously acquired from that grantor, regardless of whether the damage results from the public use of the property originally taken. They assert that, had the Legislature intended to limit the cause of action to damages that originate from or are caused by the public use of the originally taken property, it could easily have said so clearly.

{20} We do not agree. When the words used by the Legislature are viewed in context, they support the construction advanced by the City: that the Legislature intended that the damage to contiguous property compensable under Subsection B

10

is damage caused by or resulting from the under-purchase of land in an earlier transaction.

{21} Subsection B sets forth three requirements. It begins, in Subsection B(1), by requiring an original transaction between a government entity having the power of eminent domain and a private landowner, where the government acquires property either by way of a grant for public use or by condemning the land. It then requires, in Subsection B(2), "subsequent damage" to land contiguous to the land taken in the original transaction. Subsection B(3) then ties the "subsequent damage" to adjoining land to the public use of the property taken in the original transaction in three ways. *See* § 42A-1-29(B)(2)(3). First, Subsection B(3) describes the damage it intends to compensate as damage to "property contiguous to property previously taken or granted from the condemnee or grantor" in the original transaction. Section 42A-1-29(B)(3). Second, it measures the damages authorized by Subsection B with reference to the compensation received by the grantor in the original transaction. In particular, Subsection B authorizes damages at the greater of "a unit rate of five times that of the compensation or consideration [the landowner'] received for the land taken" in the original transaction, or the fair market value of the land, whichever is greater. *Id.* Third, the last sentence of Subsection B(3) indicates that the compensation can be adjusted "if the width of the property taken or damaged is not equal to the width *originally taken.*" *Id.* (emphasis added). Taken together, this

11

language indicates that the Legislature intended Subsection B to address situations where the public use of property previously acquired from a landowner causes damage to the landowner's remaining adjacent parcel. The parties agree that the example used by the district court of a utility, which acquires only the six-inch width of land it needs for its line and fails to acquire the greater width of land that will be damaged by laying and maintaining the line, is the type of conduct the Legislature seeks to discourage.

{22} Having carefully reviewed the language of Subsection B, we do not agree with the van Buskirks' claim that the plain meaning of its language is to allow quintuple compensation without regard to a causal connection between the original transaction and the damage to the landowner's contiguous property. To the contrary, when the plain language of Subsection B is read as a whole, it indicates legislative intent to require a causal connection between the government's use of property originally acquired from the landowner and the subsequent injury to the landowner's remaining contiguous land.

{23} We are not persuaded by the van Buskirks' argument that, because the Legislature could easily have added an explicit requirement that the subsequent damage originate on or be caused by the public use of the land originally purchased, the omission of that language rules out a causation requirement. The Court's responsibility is to carefully assess the words actually used by the Legislature and to

12

look to the purpose and objectives of the statute's language if that language is less than clear. *See Perea v. Baca*, 1980-NMSC-079, ¶ 22, 94 N.M. 624, 614 P.2d 541 ("A statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration." (internal quotation marks and citation omitted)).

{24}     Although our analysis of the language of Subsection B alone leads us to conclude that Subsection B is intended to compensate a landowner whose adjoining property has been damaged by the public use of property previously purchased or taken from that landowner, we acknowledge that the statutory language is awkward, and therefore, arguably less than crystal clear. We therefore review the purpose, background, and history of the statue to ensure that our analysis of the language does not lead to "injustice, absurdity, or contradiction[.]" *State v. Padilla*, 2008-NMSC-006, ¶ 7, 143 N.M. 310, 176 P.3d 299 (internal quotation marks and citation omitted).

### III.  An Analysis of the Background, Purpose, and History of the Legislative, as Well as Its Place in the Statutory Scheme, Supports Our Reading of the Statutory Language

{25}     We now proceed to examine the statutory language in the broader context of the Legislature's purpose, looking to the "spirit or reason" of the statute. *Vest*, 2021-NMSC-020, ¶ 21 (holding that if statutory language is "doubtful, ambiguous, or an

13

adherence to the literal use of the words would lead to injustice, absurdity, or contradiction, the court should reject the plain meaning rule in favor of construing the statute according to its obvious spirit or reason" (internal quotation marks and citation omitted)).

{26} The legislative purpose of Subsection B of the inverse condemnation statute is consistent with our analysis of the statutory language. The van Buskirks, the City, and the district court agree that the Legislature enacted Subsection B both to compensate landowners and to deter the government, in the exercise of its power of eminent domain, from shortchanging a private landowner by taking or purchasing less than the amount of property likely to be subsequently damaged by the intended public use. The van Buskirks contend that their reading of the Subsection B furthers this purpose by broadly punishing any damage to land, which happens to be contiguous with land previously purchased by the government from the same grantor. They claim that the Legislature did not intend to require the grantor to prove that the under-purchase of land in the original transaction caused or resulted in the subsequent damage to the grantor's adjoining property. We do not agree.

{27} To discern the Legislature's purpose, we turn to the history of Subsection B and its function within the context of our inverse condemnation statute, Section 42A-1-29, as a whole. *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 ("[W]e closely examine the overall structure of the statute we are interpreting, as

14

well as the particular statute's function within a comprehensive legislative scheme[.]" (citation omitted)).

{28}     Subsections A and B together address inverse condemnation in New Mexico. A comparison of the two subsections strongly supports the district court's conclusion that the Legislature intended to establish a cause of action different from the one it enacted in Subsection A two years earlier. (Subsection A was enacted in 1981. *See* 1981 N.M. Laws, ch. 125, § 25. Subsection B was enacted in 1983. *See* 1983 N.M. Laws, ch. 131, § 1. Subsection A establishes a general cause of action for inverse condemnation, implementing the takings clause of the New Mexico Constitution, N.M. Const. art II, § 20.[2] *North v. Pub. Serv. Co. of N.M.*, 1983-NMCA-124, ¶ 9, 101 N.M. 222, 680 P.2d 603; *see* § 42A-1-29(A). Subsection A allows a landowner to initiate an action for compensation for the fair value of the land taken or damaged without waiting for the government to initiate condemnation proceedings. *See Pub. Serv. Co. of N.M. v. Catron*, 1982-NMSC-050, ¶ 7, 98 N.M. 134, 646 P.2d 561. Fair compensation for damage to land caused by an adjoining public use can be obtained

---

[2]Subsection A states as follows: "A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation or without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation is liable to the condemnee, or any subsequent grantee thereof, for the value thereof or the damage thereto at the time the property is or was taken or damaged[.]"

by a landowner in an inverse condemnation action brought under Subsection A without any additional requirements, apart from a showing of damage from a public use. *See* UJI 13-704 NMRA (providing for damages for a partial taking). A claim for compensation for damage to land adjoining a public use brought under Subsection A does not depend upon an original transaction where the government purchased less land from the same grantor than it needed: any landowner can bring a claim for the fair market value of property that is taken for public use, or for the reduction in market value caused by damage to the property caused by a public use. *Mesich v. Bd. of Comm'rs of McKinley Cnty.*, 1942-NMSC-054, ¶ 12, 46 N.M. 412, 129 P.2d 974 ("[I]n this state . . . the right to damages runs with the land, and a subsequent purchaser may recover such damages if not paid to his predecessor in title.").

{29}    Subsection B does something quite different: it creates a private cause of action for a particular grantor. It is aimed at fairly compensating a grantor who suffered additional uncompensated damage following a previous transaction. The cause of action is intended, by its terms, to both compensate that grantor for subsequent damage to his or her adjoining property and to encourage the government to fairly evaluate the amount of land necessary for the public use of the property originally purchased.

16

{30}    The van Buskirks' reading of Subsection B, which removes from the Subsection B cause of action both the requirements that the government have under-purchased land in the original transaction and that the damage to the grantor's land resulted from or was caused by that under-purchase of land, is inconsistent with the spirit and reason of this statute. There is no reasonable basis for providing such generous additional compensation to a landowner based solely on the happenstance that land damaged by a public use is contiguous to an unrelated purchase of land years later from the same landowner. To so conclude would subject the public to potential liability well beyond that contemplated by our Legislature in this statute, which is targeted at fairly compensating grantors who suffer subsequent, uncompensated damage to their adjoining land. Subsection A, rather than Subsection B, provides the van Buskirks and those in a similar position with a cause of action in inverse condemnation for the fair value of the damage to their land if it was caused by a public use. Allowing the van Buskirks additional compensation above that permitted in a Subsection A inverse condemnation action does not serve the dual legislative purposes of fairly compensating a landowner who suffered additional, uncompensated damage following an original transaction and encouraging the fair evaluation by the government of the amount of land needed for a public use. We will not assume that the Legislature acted unreasonably. *See Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 22, 121 N.M. 205, 910 P.2d 281 ("[T]his [C]ourt must

17

presume that the [L]egislature acted reasonably." (internal quotation marks and citation omitted)).

{31}    It is undisputed in the summary judgment record that the van Buskirks were not the grantors from whom the City purchased the landfill that caused the damage alleged in this case. Likewise, there is no evidence of subsequent damage resulting from the original transaction the van Buskirks rely on here—the sale of 64.77 acres to the City. Accordingly, the van Buskirks have failed to state a cause of action under Subsection B.

## IV.    We Do Not Address the City's Remaining Arguments

{32}    Given our decision affirming the district court's grant of summary judgment, we do not reach and do not comment on the merits of the City's two remaining arguments: (1) that the Legislature never intended to authorize the sort of multi-million dollar damages sought by the van Buskirks; and (2) that the Legislature intended Subsection B to apply only to the purchase by a utility of too narrow a strip of land to lay and service its lines, where the "width" damaged and the "unit" price are both easily measurable.

## CONCLUSION

{33}    For the reasons stated, we affirm the district court's grant of summary judgment and the dismissal of this action.

{34}    **IT IS SO ORDERED.**

18

                                        _____
                                        **JANE B. YOHALEM, Judge**


**WE CONCUR:**


_____
**J. MILES HANISEE, Chief Judge**


_____
**MEGAN P. DUFFY, Judge**